**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Arliss Siebeck, *et al.*,

Plaintiffs,

v.

Juan Gonzales, *et al.*,

Defendants.

No. CV-25-04996-PHX-JJT

**ORDER**

Before the Court is Defendant Joshua Anderkin's Partial Motion to Dismiss (Doc. 26, Mot.). Plaintiff Arliss Siebeck filed a Response in opposition (Doc. 31, Resp.), and Defendant Anderkin filed a Reply (Doc. 40, Reply). The Court finds the Motion suitable for decision without oral argument. LRCiv 7.2(f). For the reasons set forth below, the Court denies the Motion.

## I. BACKGROUND

In the First Amended Complaint (Doc. 18, FAC), the operative pleading, Plaintiff alleges the following. Plaintiff is the brother of Dillon Siebeck ("Siebeck") and the personal representative of Siebeck's estate. (FAC ¶ 8.) On January 8, 2025, at approximately 7:00 p.m., Glendale Police Department ("GPD") officers were attempting to locate 23-year-old Angelo Diaz in connection with a domestic violence incident. (FAC ¶ 12.) The officers found a vehicle matching the description of Diaz's vehicle at Horizon Park in Glendale, Arizona. (FAC ¶ 13.) They believed they saw movement inside, but the vehicle's

tinted windows prevented them from confirming it. (FAC ¶ 16.) The officers ordered any occupant to exit the vehicle and received no response. (FAC ¶¶ 17–18.)

Without investigating the vehicle further, the officers turned their attention to a man sitting at a picnic table in the park. That man was Siebeck. (FAC ¶¶ 19–20.) Siebeck did not resemble Diaz. He was twice Diaz's age, was not Hispanic, and was wearing a camouflage hoodie and white or light-colored shorts, whereas the officers had been told that Diaz was wearing a black hoodie and dark pants. (FAC ¶¶ 21–22.) The officers nonetheless shifted their focus from the vehicle to Siebeck. (FAC ¶ 24.) They took cover behind their patrol vehicles, approximately 300 feet from Siebeck, and pointed their firearms at him. (FAC ¶ 26.) Defendant Juan Gonzales was among those officers and had an assault rifle trained on Siebeck. (FAC ¶¶ 25–26.) Defendant Anderkin was the sergeant leading the team. (FAC ¶ 25.)

Speaking over a public address ("PA") system from behind the patrol vehicles, Defendant Anderkin instructed "Angelo" to put his hands up and walk toward the officers. (FAC ¶ 27.) Siebeck, who was unarmed, began to comply. (FAC ¶¶ 28–29.) No one else was near Siebeck; the closest people to him were the officers behind the patrol vehicles. (FAC ¶ 29.) While Defendant Anderkin was still giving instructions, Defendant Gonzales fired two shots at Siebeck without warning. (FAC ¶ 30.) After that first volley, Defendant Anderkin gave Siebeck no further instructions. Nor did he order Defendant Gonzales to stand down, ask him why he had fired, or escort him from the scene. (FAC ¶¶ 33, 36.) Fourteen seconds after the first volley, Defendant Gonzales fired at Siebeck twice more. (FAC ¶ 37.) At least one of those shots struck Siebeck and ultimately caused his death. (FAC ¶ 37.) No other officer used force against Siebeck. (FAC ¶ 39.) Defendant Anderkin later told an investigator: "Based on my perception of the event, based on my experience, what I was observing was not providing justification for lethal force." (FAC ¶ 35.)

On December 31, 2025, Plaintiff, as personal representative of Siebeck's estate and on behalf of Siebeck's statutory beneficiaries, sued Defendant Gonzales, Defendant Anderkin, and the City of Glendale (the "City"). (Doc. 1.) The FAC asserts seven claims:

(1) excessive force in violation of the Fourth Amendment under 42 U.S.C. § 1983 against Defendant Gonzales; (2) unlawful seizure in violation of the Fourth Amendment under § 1983 against Defendant Gonzales; (3) failure to render aid in violation of the Fourth Amendment under § 1983 against Defendants Gonzales and Anderkin; (4) failure to intervene in violation of the Fourth Amendment under § 1983 against Defendant Anderkin; (5) failure to supervise in violation of the Fourth Amendment under § 1983 against Defendant Anderkin; (6) violation of the Fourth Amendment under § 1983 against the City; and (7) wrongful death under Arizona law against all Defendants. Defendant Anderkin now moves to dismiss Counts Four, Five, and Seven as asserted against him individually.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) is designed to "test[] the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal under Rule 12(b)(6) may rest on either (1) the lack of a cognizable legal theory or (2) the absence of sufficient factual allegations to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). In evaluating a complaint for failure to state a claim, the Court takes the well-pled factual allegations as true and construes them in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted). Legal

conclusions couched as factual allegations are not entitled to the assumption of truth and therefore cannot defeat a motion to dismiss. *Iqbal*, 556 U.S. at 679–80. But "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

In ruling on a Rule 12(b)(6) motion, a court may consider only the complaint, its exhibits, and matters that may be judicially noticed; if it considers anything more, the motion must be treated as one for summary judgment. Fed. R. Civ. P. 10(c), 12(d). A court may also consider "evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (citations omitted). Judicial notice, in turn, extends only to facts "not subject to reasonable dispute." Fed. R. Evid. 201(b). When a fact is properly noticed, the Court need not accept allegations that contradict it. *See Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000).

## III. ANALYSIS

### A. Body-Worn Camera Footage

As a threshold matter, both parties refer to body-worn camera footage of the incident. (Mot. at 4; Resp. at 3.) The Court will not consider that footage in ruling on the Motion.

The FAC does not refer to, attach, or incorporate any body-worn camera footage, so the incorporation exception recognized in *Marder* does not apply. Nor will the Court take judicial notice of the footage in this instance. Plaintiff represents that "[a] broad universe of [bodycam] footage of this incident exists" (Resp. at 4), and the parties' competing descriptions of what the footage shows confirm that its content and significance are subject to reasonable dispute. Taking into consideration some recordings but not others at this stage of the litigation would require the Court to draw an arbitrary line and potentially resolve contested factual questions before any discovery has taken place. The

Court also declines to convert the Motion into one for summary judgment. *See* Fed. R. Civ. P. 12(d).

Defendant Anderkin himself articulates the governing principle: "[t]he FAC must plead a plausible claim against Anderkin, not posit that undisclosed footage might someday supply missing facts. Plaintiff cannot avoid dismissal by pointing to evidence outside the FAC that may or may not exist . . . ." (Reply at 2–3.) The Court agrees, and that principle applies equally to both sides. Accordingly, the analysis that follows rests on the FAC alone.

**B. Failure to Intervene (Count Four)**

"Pursuant to a long line of civil cases, police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996); *see also Tobias v. Arteaga*, 996 F.3d 571, 583–84 (9th Cir. 2021); *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000), *as amended* (Oct. 31, 2000). An officer who breaches that duty may be held liable under 42 U.S.C. § 1983.

A failure to intervene claim has two elements. First, there must be an underlying constitutional violation by another officer. *See, e.g.*, *Cunningham*, 229 F.3d at 1289; *Tobias*, 996 F.3d at 583–84. Second, the bystander officer must have had a realistic opportunity to intervene in that violation and failed to do so. *Cunningham*, 229 F.3d at 1289–90.

**1. Underlying Constitutional Violation**

Plaintiff bases the first element on the excessive force and unlawful seizure claims against Defendant Gonzales. (*See* FAC ¶ 120.) Defendant Anderkin does not challenge the sufficiency of those claims. (*See* Mot.; Resp.) Construing the FAC's allegations in the light most favorable to Plaintiff, the Court finds that Plaintiff has plausibly alleged that Defendant Gonzales used excessive force against Siebeck and unlawfully seized him. The first element is therefore satisfied at this stage, and the Court turns to the element the parties dispute.

**2. Realistic Opportunity to Intervene**

Defendant Anderkin's Motion centers on the second element: whether he had a realistic opportunity to intervene in Defendant Gonzales's conduct. (Mot. at 5–6.) That question is fact-intensive. No fixed rule defines a realistic opportunity, but courts typically consider the bystander officer's physical presence and proximity to the acting officer, the duration of the violation, and the officer's awareness that a violation was occurring. *See Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2022) (holding that there was no realistic opportunity to intervene in "fleeting acts" that "came without warning"); *Ramirez v. Butte-Silver Bow Cnty.*, 298 F.3d 1022, 1029 (9th Cir. 2002) (foreclosing failure to intercede liability for line officers who could not have known of the defective warrant that gave rise to the underlying constitutional violation), *aff'd sub nom. Groh v. Ramirez*, 540 U.S. 551 (2004); *Cunningham*, 229 F.3d at 1290 (finding no realistic opportunity where the bystander officers were not present at the scene when the alleged constitutional violation occurred).

Defendant Anderkin first argues that the FAC manufactures a realistic opportunity to intervene through conclusory assertions and hindsight-driven speculation. (Mot. at 6.) If that were so, the claim could not survive. *Iqbal*, 556 U.S. at 679–80; *see Andrich v. Kostas*, 470 F. Supp. 3d 1048, 1060–61 (D. Ariz. 2020) (dismissing a failure to intervene claim that rested on conclusory statements rather than facts about the shooting, its timing, or the officers' proximity). But that is not an accurate description of the FAC.

Defendant Anderkin focuses on a single paragraph of the FAC:

> Anderkin had ample opportunity to intervene. Anderkin could have told Gonzales to stand down, or asked Gonzales why he fired. Notwithstanding that Anderkin saw no justification for lethal force, Anderkin nonetheless never intervened after Officer Gonzales's first volley of shots. He did not instruct Officer Gonzales to stand down, nor did he ask Officer Gonzales what he saw that caused him to shoot, nor did he escort Officer Gonzales from the scene.

(FAC ¶ 36.) Standing alone, this paragraph would not establish a realistic opportunity to intercede because much of it is conclusory and framed in hindsight, much like the allegations in *Andrich*. But the paragraph does not stand alone. The FAC also alleges specific facts about the time between the two volleys (FAC ¶ 33), the circumstances of the shooting (FAC ¶¶ 26–34, 37–38), Defendant Anderkin's own assessment of the shooting (FAC ¶ 35), and the positions of Defendant Anderkin, Defendant Gonzales, the other officers, and Siebeck. (FAC ¶¶ 24–26.) Because a Rule 12(b)(6) motion tests the complaint as a whole, those factual allegations, not the single paragraph Defendant Anderkin isolates, form the basis of the analysis.

Defendant Anderkin next argues that the fourteen-second interval alleged in the FAC was too short to give him a realistic opportunity to intercede. (Mot. at 6–7.) Timing matters, and the cases Defendant Anderkin cites give this argument some force. But none of those cases treats a short interval as dispositive on its own. In each, the brevity of the event was one consideration among several.

In *Hughes*, for example, the Ninth Circuit held that the bystander officers had no opportunity to intervene in a canine apprehension not only because it happened quickly, but also because one officer was on the opposite side of the home, the other two were not canine handlers, the struggle to apprehend the plaintiff was chaotic, and the force came without warning. 31 F.4th at 1223. The same is true of the other cases on which Defendant Anderkin relies. *See, e.g.*, *Cortesluna v. Leon*, 979 F.3d 645, 656 (9th Cir. 2020) (finding no opportunity where the bystander officer did not know the acting officer had decided to shoot and the event unfolded in about two seconds), *rev'd on other grounds by Rivas-Villegas v. Cortesluna*, 595 U.S. 1 (2021); *Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir. 1991) (concluding that no opportunity to intervene existed because of the bystander agents' positions relative to the acting agent and their lack of any reason to know he would shoot, not merely because the event unfolded in seconds). Because no fixed rule defines a realistic opportunity to intercede, the temporal interval alleged in the FAC must be weighed together with the FAC's other factual allegations, not in isolation.

Weighed that way, the allegations are sufficient. The FAC alleges that fourteen seconds passed between Defendant Gonzales's first and second volleys (FAC ¶ 37) and that Defendant Anderkin said nothing to Defendant Gonzales during that time (FAC ¶ 121). It alleges that the officers, Defendant Gonzales among them, had taken cover behind their patrol vehicles and were pointing their firearms at Siebeck. (FAC ¶¶ 24, 26.) Defendant Anderkin was leading that team and was instructing Siebeck over the PA system from behind the vehicles. (FAC ¶ 25, 27.) Siebeck was approximately 300 feet away, unarmed, and complying with Defendant Anderkin's instructions. (FAC ¶¶ 26, 28–29.) And after the shooting, Defendant Anderkin told an investigator that "based on my perception of the event, based on my experience, what I was observing was not providing justification for lethal force." (FAC ¶ 35.)

Construing these allegations together and in the light most favorable to Plaintiff, the Court concludes that Plaintiff has plausibly alleged that Defendant Anderkin had a realistic opportunity to intercede before the second volley of shots and failed to do so. Fourteen seconds is enough time for the sergeant in command to order his officers to stand down or, at a minimum, to ask who fired and why. That interval is meaningfully longer than the two seconds at issue in *Cortesluna*, 979 F.3d at 650, and a pair of volleys separated by 14 seconds is not the kind of "fleeting act[]" that came without warning in *Hughes*, 31 F.4th at 1223.

The question of warning is what most clearly separates this case from Defendant Anderkin's cited authorities. In *Ting* and most of the other cases Defendant Anderkin cites, a single shot or round of shots was fired without warning, and the bystander officers had no reason to anticipate it. 927 F.2d at 1508. Here, by contrast, the alleged violation came in two stages. By the time of the second volley, an officer under Defendant Anderkin's command had already fired twice at an unarmed man who was complying with Defendant Anderkin's own instructions. The first volley was itself the warning, and therefore, the Court can reasonably infer that, after hearing it, Defendant Anderkin was on notice that

more shots might follow, contrary to his argument that he could not have anticipated them. (Mot. at 7.)

Defendant Anderkin's argument that he could not see Defendant Gonzales (Mot. at 7) is likewise unpersuasive. The FAC describes the officers, including Defendant Gonzales, positioned together behind their vehicles under Defendant Anderkin's command, with their firearms trained on an unarmed man roughly 300 feet away. That distance separated the officers from Siebeck; nothing in the FAC suggests any comparable distance between Defendants Anderkin and Gonzales. On these allegations, it is reasonable to infer that Defendant Anderkin knew the first volley came from one of his own officers rather than from Siebeck, who was unarmed and alone. And Defendant Anderkin did not need to know which officer had fired in order to act. These alleged circumstances are materially different from cases in which the bystander officers were not present when the violation occurred, *Cunningham*, 229 F.3d at 1290, or lacked the practical means to prevent it, *see Hughes*, 31 F.4th at 1223 (finding that FBI agents who were not canine handlers were less equipped to intervene when an FBI canine attacked the plaintiff).

Defendant Anderkin also characterizes the scene as chaotic, "high-risk [and] fast-moving," such that intervention within fourteen seconds was not realistic. (*See* Mot. at 6.) However, the FAC describes a different scene. As alleged, Siebeck was unarmed, approximately 300 feet from the officers, complying with Defendant Anderkin's instructions, and alone. (FAC ¶ 29.) The Court recognizes that the officers were investigating a domestic violence incident and searching for a suspect (FAC ¶ 12), giving some weight to Defendant Anderkin's characterization. But taken as a whole and construed in Plaintiff's favor, the FAC depicts a scene that was controlled, not chaotic, which supports the inference that, during the fourteen seconds after the first volley, Defendant Anderkin could have ordered his officers to stand down. The FAC alleges that he did not. (FAC ¶ 121.)

Finally, Defendant Anderkin's statement to the investigator that, based on his perception and experience, lethal force was not justified supports the inference that he

recognized in real time that Defendant Gonzales was using excessive force. That awareness is a necessary component of a realistic opportunity to intervene. *See Ramirez*, 298 F.3d at 1029. Defendant Anderkin may argue that the statement reflects only a post-incident judgment, but at this stage the Court must draw reasonable inferences in Plaintiff's favor, and the statement is expressly framed in terms of what Defendant Anderkin was "observing" at the time of the shooting. Considering that awareness together with the fourteen-second interval, the officers' proximity to one another, the state of the scene, Defendant Anderkin's command authority, and his alleged inaction, Plaintiff has alleged sufficient facts to show that Defendant Anderkin had a realistic opportunity to intervene before the second volley and failed to do so. Plaintiff has therefore stated a plausible failure to intervene claim against Defendant Anderkin.

**C. Failure to Supervise (Count Five)**

Supervisors are not vicariously liable under § 1983 for the conduct of their subordinates; each official is liable only for his own misconduct. *See Iqbal*, 556 U.S. at 676–77. "A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). "The requisite causal connection can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Felarca v. Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018) (quoting *Starr*, 652 F.3d at 1207–08).

Plaintiff proceeds on the second theory, alleging that Defendant "Anderkin knowingly refused to terminate a course of conduct by [Defendant] Gonzales that he knew, or reasonably should have known, would inflict a constitutional injury." (Resp. at 9; FAC ¶¶ 125–32.) Although this claim arises from the same events as the failure to intervene claim, it asks a different question. The failure to intervene claim asks whether Defendant

Anderkin, as an officer on the scene, had a realistic opportunity to stop a fellow officer's violation. The supervisory claim asks whether Defendant Anderkin, as the officer in command, knowingly refused to stop a subordinate's conduct that he knew or should have known would cause a constitutional injury. The first turns on opportunity; the second turns on supervisory authority, knowledge, and causation.

As a threshold matter, Plaintiff adequately alleges that Defendant Anderkin had supervisory authority over Defendant Gonzales. (FAC ¶ 25.) Such authority is a prerequisite to supervisory liability. *Felarca*, 891 F.3d at 820 ("Because these administrators had no supervisory authority over the police who allegedly committed the violations, they did not participate in or cause such violations."). Defendant Anderkin does not dispute that he had such authority.

Defendant Anderkin first argues that the claim fails because the FAC does not show that Defendant "Anderkin set in motion Officer Gonzales's second volley, directed or ordered his use of force, approved it, or implemented any policy or practice that caused it." (Mot. at 9.) Plaintiff's claim does not rest on any of those theories, so the Court need not address them.

Defendant Anderkin's relevant argument is that the FAC fails to allege (1) that he had notice that Defendant Gonzales was likely to fire a second volley, or (2) that he knew or reasonably should have known "that any act or omission on his part would cause Officer Gonzales to inflict a constitutional injury." (Mot. at 9.) As with the failure to intervene claim, Defendant Anderkin contends that Plaintiff relies on hindsight and speculation and that he cannot be held liable for failing to act in the "span of seconds after the first shots" while managing a "high-risk scene." (Mot. at 9.) The Court is not persuaded by either argument for similar reasons from the prior section of this order.

Regarding notice, the FAC alleges that Defendant Gonzales fired the first volley without warning. (FAC ¶ 30.) It further alleges that the team Defendant Anderkin was leading was positioned behind patrol vehicles with firearms pointed at Siebeck, who was unarmed, approximately 300 feet away, and alone. (FAC ¶¶ 25–26, 29.) Defendant

Anderkin was instructing Siebeck over a PA system from behind the same vehicles. (FAC ¶ 27.) Construed in Plaintiff's favor, these allegations support the inference that Defendant Anderkin heard the first volley and knew it came from one of his officers, because he was positioned with them. They also support the inference that Defendant Anderkin could see Siebeck while instructing him and therefore knew that neither Siebeck nor anyone else in the park had fired. An officer under his command had just fired at an unarmed, compliant man without warning, so it is reasonable to infer that Defendant Anderkin was on notice that a second, equally unjustified volley could follow.

Regarding knowledge and causation, and for similar reasons as above, the FAC adequately alleges that Defendant Anderkin knew or should have known that his failure to act would result in a constitutional injury. The FAC alleges facts showing that Defendant Anderkin knew a second volley could come without warning, just as the first had. The scene it describes, with several officers behind cover aiming firearms at an unarmed man roughly 300 feet away, supports the inference that Defendant Anderkin understood that continued use of deadly force would be excessive and unconstitutional. His later statement that lethal force was not justified based on his perception of the event and his experience reinforces that inference. (FAC ¶ 35.) Yet the FAC alleges that Defendant Anderkin said nothing to Defendant Gonzales during the fourteen seconds between the volleys. (FAC ¶ 36.) A commanding officer's alleged silence in the face of a subordinate's apparently unjustified use of deadly force plausibly amounts to a "knowing[] refus[al] to terminate a series of acts by others" that the supervisor "knew or reasonably should have known would cause others to inflict a constitutional injury." *Felarca*, 891 F.3d at 820. And because the second volley of shots is the one alleged to have killed Siebeck, the FAC plausibly alleges the required causal connection between that refusal, the excessive force, and the injury. (FAC ¶ 37.)

Defendant Anderkin may ultimately be able to show that fourteen seconds was too short for him to prevent Defendant Gonzales from firing again, or that the scene was far more chaotic than the FAC describes. But those are factual questions to be developed in

discovery. On this Motion, the Court's task is limited to deciding whether the FAC's allegations, construed in Plaintiff's favor, state a plausible claim, and for the reasons above, Plaintiff has plausibly stated a failure to supervise claim against Defendant Anderkin.

**D. Wrongful Death (Count Seven)**

Arizona's wrongful death statute provides that "[w]hen death of a person is caused by wrongful act [sic], neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action to recover damages in respect thereof," then the person or entity liable is subject to a wrongful death cause of action. A.R.S. § 12-611. A wrongful death claim may be brought by a surviving spouse, child, parent, or guardian, or by the personal representative of the decedent's estate. A.R.S. § 12-612. Plaintiff, as personal representative of Siebeck's estate, alleges that Defendant Anderkin was negligent in failing to intervene in, and failing to supervise, Defendant Gonzales's use of excessive force against Siebeck. (FAC ¶ 158.)

Importantly here, under Arizona law, law enforcement officers acting within their discretionary authority are entitled to qualified immunity. *Chamberlain v. Mathis*, 729 P.2d 905, 909 (Ariz. 1986); *Spooner v. City of Phoenix*, 435 P.3d 462, 466–67 (Ariz. Ct. App. 2018) (finding that "a public official performing a discretionary act encompassed within her public duties is shielded from liability for simple negligence"). That immunity is overcome if the officer "knew or should have known that he was acting in violation of established law or acted in reckless disregard of whether his activities would deprive another person of their rights." *Chamberlain*, 729 P.2d at 912; *Jennings v. Agne*, 520 P.3d 665, 669 (Ariz. Ct. App. 2022) ("If immunity applies, an officer is shielded from liability unless the conduct rises to gross negligence or recklessness."); *see also Spooner*, 435 P.3d at 467 ("A public official's conscious disregard of the law or the rights of others constitutes gross negligence and she remains liable for such conduct.") (citations omitted). An officer is grossly negligent "if he acts or fails to act when he knows or has reason to know facts which would lead a reasonable person to realize that his conduct not only creates an unreasonable risk of bodily harm to others but also involves a high probability that

substantial harm will result." *Walls v. Ariz. Dep't of Pub. Safety*, 826 P.2d 1217, 1221 (Ariz. Ct. App. 1991).

Because Defendant Anderkin was acting within his discretionary authority, Plaintiff's wrongful death claim against him survives only if the FAC plausibly alleges that he acted with gross negligence. *Chamberlain*, 729 P.2d at 909. Defendant Anderkin contends that it does not. (Mot. at 11.) He repeats the arguments he made against the failure to intervene and failure to supervise claims: he was "directing a fluid, high-risk situation," and he could not have prevented Defendant Gonzales's second volley within fourteen seconds. (Mot. at 11.) He therefore concludes that the FAC does not allege that he knew or should have known that his acts or omissions created an unreasonable risk of bodily harm to Siebeck with a high probability of substantial harm. (Mot. at 11.) For the same reasons discussed in the prior sections, and those set forth in Plaintiff's Response (Resp. at 11–12), the Court disagrees.

To reiterate, the FAC alleges that Defendant Gonzales, without warning, fired two shots at Siebeck that missed, and then fired twice more fourteen seconds later, striking and killing him. (FAC ¶¶ 30, 37.) It alleges that Defendant Anderkin was leading the officers confronting Siebeck and was positioned behind the patrol vehicles with Defendant Gonzales and the rest of the team, approximately 300 feet from Siebeck. (FAC ¶¶ 25–27, 29.) It alleges that during the fourteen seconds between the volleys, Defendant Anderkin neither gave a stand-down order nor asked Defendant Gonzales why he had fired. (FAC ¶ 38.) And it alleges that, after the shooting, Defendant Anderkin told an investigator that he did not believe lethal force was justified. (FAC ¶ 35.)

Construing these allegations in Plaintiff's favor, the Court concludes that Plaintiff has plausibly alleged gross negligence. Each component of the *Walls* standard is supported by the FAC. First, as to what Defendant Anderkin knew: because the first volley came without warning from the team's position, it is reasonable to infer that Defendant Anderkin knew Defendant Gonzales might fire again without warning. And given his own statement, it is reasonable to infer that he knew lethal force was unjustified. Second, as to the risk:

further rifle fire at an unarmed man carried an obvious unreasonable risk and high probability of death or serious bodily injury. Third, as to his conduct: despite that knowledge of the risk, Defendant Anderkin, the sergeant in command, allegedly gave no instruction and made no inquiry during the fourteen seconds between the volleys. It is reasonable to infer that he knew, or at least should have known, that his failure to exercise his supervisory authority would allow that risk to materialize. Because the second volley is alleged to have killed Siebeck, the FAC also plausibly alleges that this failure to act caused Siebeck's death. Whether Defendant Anderkin's conduct in fact rose to the level of gross negligence is a question for a later stage of the case. As for now, Plaintiff has stated a plausible wrongful death claim against Defendant Anderkin through the alleged facts in the FAC.

## IV. CONCLUSION

Taking the FAC's allegations as true and construing them in Plaintiff's favor, Plaintiff has stated plausible claims against Defendant Anderkin for failure to intervene (Count Four), failure to supervise (Count Five), and wrongful death (Count Seven).

**IT IS THEREFORE ORDERED** denying Defendant Anderkin's Partial Motion to Dismiss (Doc. 26).

Dated this 30th day of September, 2026.

Honorable John J. Tuchi
United States District Judge